Nashville, Chattanooga & St. Louis Ry. *v.* Harvey Hannah *et al.,* Commissioners.

(*Nashville,* December Term, 1929.)

Opinion filed, May 24, 1930.

FITZGERALD HALL and SETH WALKER, for plaintiff in error.

ROY H. BEELER, Assistant Attorney-General, for defendant in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Desiring to modify its passenger service between certain points, the Railway gave public notice of such intention. Before the date of the taking effect of the proposed modification, the State Railroad & Public Utilities Commission issued an order directing the Railway to appear on a day set to show cause why an order should not be entered forbidding it to modify its passenger train service, unless and until the Commission on an application duly made so authorized.

The Railway appeared to challenge the jurisdiction of the Commission, filing an answer explaining its purpose and showing the limited nature of the modification and the necessity therefor, and particularly showing that the Railway purposed to continue to furnish adequate passenger service between the points involved. The Commission held that the Railway could make no reduction of any kind in such service without first obtaining the approval and authority of the Commission. Thereupon the Railway filed its petition for *certiorari* and *supersedeas* in the Circuit Court of Davidson County, setting forth the facts. A demurrer being sustained to this petition the case was appealed to this Court.

It is proposed by the Railway to make two changes, cancelling a local train operating week days between Nashville and Tullahoma, and another between Nashville

and Dickson. The following statement of facts is made on the brief as to one of the changes, and the facts of the other change are substantially the same:

"The Railway for many years operated between Nashville and Tullahoma, a distance of 69.33 miles, and beyond, six passenger trains in each direction each day running on regular schedule. Among these trains was the so-called 'Tullahoma Accommodation,' being trains seven and eight, operating daily except Sunday between Nashville and Tullahoma. For a long time the Tullahoma Accommodation's gross passenger revenues have failed to pay more than about one-half of the actual out-of-pocket cost of running this train, even eliminating from consideration anything for taxes, supervision, maintenance of roadway and structures, interest on bonds, etc. This has been due largely to the revolution in transportation brought about by good roads and automobiles. As there was no public need for or use in any substantial degree of this train the Railway proposed to discontinue it, but the Railway proposed to continue to operate between Nashville and Tullahoma and beyond every day the other five regular passenger trains in each direction. In other words, only two useless trains out of a fleet of twelve daily trains were to be discontinued."

The extent of the jurisdiction of the commission is the sole question involved, and counsel appear to agree that this is to be determined by a construction of Chapter 64 of the Acts of 1927, which is as follows:

"AN ACT to empower and direct the Railroad and Public Utilities Commission of the State of Tennessee to authorize the discontinuance of intra-state railroad passenger service upon certain conditions.

"SECTION 1. Be it enacted by the General Assembly of the State of Tennessee, That the Railroad and Public Utilities Commission of the State of Tennessee shall have the power, after notice and hearing, and it shall be its duty so to do, to authorize common carriers by railroad in Tennessee to entirely discontinue particular intrastate passenger service by steam railroad when the following conditions are shown to exist, viz.:

"(a) Whenever any particular intra-state passenger service by railroad is regularly carried on at a loss and there is no reasonable probability that such condition shall be substantially changed; and,

"(b) Whenever any particular intra-state passenger service by railroad has for any reason become unnecessary in the public interest.

"Provided, that nothing in this Act shall in any way affect any railroad or part of a railroad now involved in proceedings before the Interstate Commerce Commission for abandonment."

For the Railway stress is laid upon the language in Section 1, "to entirely discontinue;" it being plausibly insisted that by the use of the word "entirely" the Legislature made its intention clear to restrict the operation of the act conferring jurisdiction upon the Commission to cases in which it was the purpose of a common carrier railroad to abandon altogether passenger service on some portion of its lines or between certain points.

On the other hand, counsel for the Commission select for emphasis the reiterated language occurring in the Act, "particular intra-state passenger service," defining the word "particular" and insisting that its use indicates an intention on the part of the Legislature to confer upon the Commission the power to determine whether or not

a change or modification in any particular should be made in intra-state passenger service by railroads.

It does not appear to be contended that the Commission has powers beyond and other than those conferred by Statute; and while the Commission has been long established and has had conferred upon it by various acts jurisdiction over steam railroads, public utilities and common carriers by bus and truck, it appears to be conceded, as already indicated, that no jurisdiction over train service on steam railroads has in any manner been conferred other than by the Act of 1927, hereinabove set forth.

Not only do we find no previous statutory enactments restricting the right of a railroad to control and change its train service, but it will be observed that the Act of 1927, supra, does not in terms do so. The Act is permissive only, apparently assuming the existence of some legal limitation upon this power, and making provision for the meeting of such necessity as may arise.

With this in mind, and looking to the act as a whole, it appears to have been the intention by this act to confer upon the Commission power, not theretofore possessed, to relieve the railroads of public service obligations, which under changing conditions had become unduly burdensome; and that the act was passed for the benefit of the railroads of the State. While there appears to have been no statutory restriction upon the power of a railroad corporation to regulate in its discretion its train service, it was doubtless recognized that railroad corporations—in common with other public service utilities holding franchises conferring condemnation and other privileges—are under obligations to perform all their functions fairly and fully in the interest of the public, and that an arbitrary and unjustified failure in this regard would subject them to proceedings by man-

damus, or perhaps their charters and franchise rights to forfeiture. See 1 Elliott on Railroads, paragraphs 59, 60, as to such obligation, and the same authority, Vol. 2, paragraphs 735, 736, as to the right to compel performance by mandamus.

We think it may fairly be deduced that it was the intention of the Legislature, having these conditions in mind, and also having in mind modern changing conditions of competitive motor bus transportation, to provide by this Act of 1927 a method by which the reasonableness of and justification for modifications found by railroad managements to be necessary in their programs of train service might be passed upon by a duly authorized semi-judicial authority. By this act a tribunal was vested with authority to determine, in any given case, as between the public and the public servant whether or not the proposed modification was justified. Upon the arising of a debatable issue between the Railway Company and the public served by it, the act empowers the Commission to determine the issue and thereby relieve the Railroad of the danger of successful attack on the ground of abandonment, non-user, or inadequate discharge of its charter and franchise obligations and possible impairment of its valuable rights.

Now construing the language of this Act in the light of its object as above stated, we are of opinion that the intent is to deal alone with proposals of changes which involve such a discontinuance of passenger service in extent and effect as might become the subject of reasonable dispute as to the power of the railroad management to act without such statutory authorization.

As above suggested, an entire discontinuance of passenger service by a railroad corporation, chartered pri-

marily for this purpose, might well be construed as such an abandonment and non-user of its franchise as would subject it to proceedings for forfeiture. And so of such entire discontinuance over a branch or subdivision thereof. It is well known that the petitioner, and other large railroad corporations, operate under lease or ownership branch lines. As, for example, petitioner's branch road from Tullahoma to McMinnville, or from Cowan to Tracy City. Now it is altogether possible that, under changing conditions, it might be thought desirable by petitioner to discontinue entirely passenger service on one or more of such branch roads, or divisions, continuing to operate them for freight transportation only, and debate might reasonably arise as to the effect which this degree of nonuser might have upon the franchise privileges of petitioner with respect to such particular branches, and as to the right of the railroad corporations as between itself and the public affected, to take such a radical step. It is, in our opinion, to this class of cases, wherein entire discontinuance of passenger service over all or some particular part of a railroad company's lines is proposed, to which this legislation was directed.

This would seem to be so because the right of the management of a railroad corporation merely to re-arrange its train service between points, and enlarge or decrease the number of its trains, has never been questioned, either with respect to intra-state or interstate railroads. On the other hand, the charter form for railroads set out in the General Corporation Act of 1875, Chapter 142, Section 6, expressly makes it the duty of the Board of Directors to fix the times for running of trains and to furnish sufficient accommodation for the convenient transportation of passengers and freight. Shannon's

Code, sec. 2420. We think it was not the intention of the Legislature to encroach upon the authority to fix the schedules for its train service universally recognized as vested in the railroad management, within limits hereinbefore suggested, or to provide relief and a remedy where none was apparently needed.

This construction is consistent with the express language of the Statute empowering the Commission, "to authorize common carriers by railroad in Tennessee to entirely discontinue particular intra-state passenger service" under conditions set forth. To "entirely discontinue" is a thing essentially different from mere rearrangement of trains and schedules. The word "particular" fairly refers to that definite and specific part or section of any railroad system over which entire discontinuance of passenger service is contemplated.

For the reasons indicated, we find it necessary to reverse the judgment below and sustain the petition.